UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DST SYSTEMS, INC., THE ADVISORY
COMMITTEE OF THE DST SYSTEMS, INC.
401(K) PROFIT SHARING PLAN and THE
COMPENSATION COMMITTEE OF THE
BOARD OF DIRECTORS OF DST
SYSTEMS, INC.,

                        Plaintiffs,

                                                    Case No. _____

                        v.

RUANE, CUNNIFF & GOLDFARB INC.,                     **COMPLAINT**
RUANE, CUNNIFF & GOLDFARB LLC,
RUANE, CUNNIFF & GOLDFARB L.P.,
ROBERT D. GOLDFARB, DAVID M. POPPE,
MICHAEL N. SLOYER, JOHN B. HARRIS,
WENDY D. GOODRICH, PATRICK L.
DENNIS, and JOHN DOES 1–20,
                        Defendants.

Plaintiffs DST Systems, Inc. ("DST"), the Advisory Committee of the DST

Systems, Inc. 401(k) Profit Sharing Plan (the "Advisory Committee"), and the Compensation

Committee of the Board of Directors of DST Systems, Inc. (the "Compensation Committee")

(collectively, the "DST Parties"), by and through their undersigned attorneys, for their complaint

against Ruane, Cunniff & Goldfarb, Inc. ("Ruane"), Ruane, Cunniff & Goldfarb LLC, Ruane,

Cunniff & Goldfarb L.P. (collectively, the "Ruane Defendants") and Robert D. Goldfarb, David

M. Poppe, Michael N. Sloyer, John B. Harris, Wendy D. Goodrich, Patrick L. Dennis, and John

Does 1–20 (collectively, the "Individual Defendants" and, together with the Ruane Defendants,

the "Defendants"), allege as follows:

**Nature of the Action**

1.      From 1973 until July 31, 2016, Ruane served as the discretionary

investment manager of the Profit Sharing Plan ("PSP") of the DST Systems, Inc. 401(k) Profit

Sharing Plan (the "Plan").  During all of the relevant time period until his resignation from Ruane on March 23, 2016, Robert D. Goldfarb was the principal portfolio manager for the PSP.

2.      Under Ruane and Goldfarb's direction, the PSP invested in 2010 in Valeant Pharmaceuticals, Inc. ("Valeant").  In the years after Ruane and Goldfarb made that investment, the Valeant share price, and, as a result, the value of the Valeant position in the PSP, increased substantially before declining dramatically beginning in the fall of 2015.  The Valeant investment made by Ruane and Goldfarb has led to hundreds of lawsuits against Ruane and the DST Parties arising out of Ruane and Goldfarb's investment in Valeant on behalf of the PSP. The DST Parties bring this complaint seeking contribution and indemnification from Ruane and Goldfarb to ensure that they are held financially responsible for their share of the litigation that resulted from the investment decisions that they made.  The DST Parties also seek to avoid fraudulent conveyances made by Ruane to Ruane insiders—its current or former partners and members—that, by Ruane's own admission, have rendered it unable to satisfy its obligations from the constellation of litigation that Ruane's actions engendered.

3.      Ruane had complete investment discretion to purchase, retain, or sell investments like Valeant on behalf of the PSP.  In the investment management agreements between Ruane and DST, Ruane acknowledged that it had "full authority and sole discretion" to manage the Plan assets committed to its responsibility.  Ruane likewise acknowledged in the investment management agreements that it was a fiduciary to the Plan and that its investment management of Plan assets was subject to the Employee Retirement Income Security Act of 1974 ("ERISA").  Each of Ruane and Goldfarb were fiduciaries of the Plan under ERISA Section 3.  Ruane was paid millions of dollars in management fees for its investment management services on behalf of the Plan.

4.      In or around April 2010, Ruane, at Goldfarb's direction, purchased approximately 75,000 shares in Valeant on behalf of the Plan.  By the end of 2010, Ruane had purchased a total of approximately 1.6 million Valeant shares on behalf of the PSP.

5.      Between 2010 and mid-2015, the price of Valeant shares rose tremendously from approximately $28 per share as of December 31, 2010 to approximately $260 per share by July 31, 2015.  As a result of this share price appreciation, the proportion of the PSP represented by the Valeant investment rose from approximately 10% in 2010 to more than 40% by mid-2015.

6.      The DST Parties monitored Ruane and Goldfarb's performance and the PSP's exposure to Valeant.  Over the course of 2014 and 2015, members of the DST Advisory Committee, the named fiduciary of the Plan, engaged in numerous discussions with Goldfarb concerning the PSP's growing concentration in Valeant.  In August 2015 (when Valeant's share price was at or near its peak), and despite Ruane and Goldfarb's insistence that the Valeant position remained a good investment and should not be sold, the Advisory Committee directed Defendants to reduce the Valeant position to 25% or less of the PSP.  The Advisory Committee's direction was memorialized in a letter to Goldfarb dated August 28, 2015, which instructed Ruane to reduce the Valeant concentration in the PSP to no more than 25% of the PSP.

7.      Ruane and Goldfarb, however, sold almost none of the Valeant shares in the PSP after receiving the Advisory Committee's directive.  Between August and September 2015, Ruane sold only 19,200 shares of the 1,572,207 shares it originally purchased in 2010— less than 1.25% of the Valeant investment held in the PSP.  Had Ruane and Goldfarb complied promptly with the Advisory Committee's directive, the PSP would have avoided significant

reductions in the value of the PSP that occurred in September and October 2015 when Valeant's share price declined substantially.

8.     Following the Advisory Committee's termination of its investment management agreement with Ruane on July 31, 2016, numerous Plan participants filed lawsuits in federal court (the "Federal Actions") and arbitration demands with the American Arbitration Association (the "AAA Arbitrations") against the DST Parties and Ruane alleging violations of ERISA based on purported breaches of fiduciary duties involving Ruane's decision to invest in, and later failure to sell, Valeant on behalf of the PSP.  Ruane and Goldfarb were solely responsible for the investment decisions involving Valeant, which form the basis of the claims asserted in the Federal Actions and AAA Arbitrations.  Ruane and Goldfarb had sole and complete discretion to purchase Valeant shares and to sell the Valeant investment at any time.

9.     The DST Parties have incurred substantial costs defending the Federal Actions and the AAA Arbitrations, all of which are a direct result of Ruane and Goldfarb's decision to invest in and retain Valeant.  In fact, had Ruane and Goldfarb faithfully implemented the Advisory Committee's directive to reduce the concentration of Valeant held in the PSP, it is likely that the Federal Actions and AAA Arbitrations would not have been brought at all.

10.     The DST Parties deny any and all liability in connection with the Valeant investment or the Plan, including allegations that (i) they breached any fiduciary duties to the Plan; (ii) they are liable to the Plan or the Plan's participants; and (iii) the Plan or Plan's participants suffered any losses or harm as a result of the DST Parties' actions.  As set forth below, to the extent anyone is responsible for any alleged harm suffered by the Plan or the Plan's participants in connection with the Valeant investment, it is Ruane and Goldfarb, not the DST Parties.

11.     The DST Parties bring this action to recover damages, if any, based on findings of liability and assessed damages in any of the AAA Arbitrations or the Federal Actions, settlements reached in any of the AAA Arbitrations or Federal Actions, and the costs incurred by the DST Parties in connection with the AAA Arbitrations and Federal Actions.  The DST Parties assert these claims without admitting any liability or wrongdoing whatsoever.

12.     In addition to seeking that relief, the DST Parties seek to avoid fraudulent conveyances made by certain of the Ruane Defendants.  In an effort to avoid or reduce potential liability, the Ruane Defendants have transferred assets to the Individual Defendants.  These transfers have, by the Ruane Defendants' own admission, rendered them insolvent after taking into account their contingent liability associated with the claims made against Ruane arising out of its management of the PSP.  The DST Parties thus seek to avoid as constructive and/or fraudulent conveyances made by Ruane to the Individual Defendants as partnership distributions or equivalent transfers.

13.     The Ruane Defendants and their agents have repeatedly admitted that the Ruane Defendants lack the financial wherewithal to fund any substantial settlement amounts or satisfy judgments in the Federal Actions or Arbitrations, if any, commensurate with their fault, despite the fact that Ruane has been aware since at least March 2016 of the contingent liability associated with claims against it arising out of the Plan.  Based on its public filings with the U.S. Securities and Exchange Commission, Ruane appears to earn more than $100 million in annual revenue.  The only explanation for Ruane's assertions that it lacks the assets to fund any settlement or liability in the various litigations brought against it commensurate with its fault is that the Ruane Defendants have improperly distributed to its members and/or partners all or a substantial part of their profits which thereby renders Ruane insolvent after accounting for the

contingent liability associated with the various actions arising out of Ruane's investment management of the Plan.

## The Parties

14.     DST is a global provider of technology-based information processing and servicing solutions, with its principal executive offices located in Kansas City, Missouri.

15.     The Compensation Committee, which consists of members appointed by DST's Board of Directors, is responsible for selecting members of the Advisory Committee.  The Compensation Committee has the authority to amend or terminate the Plan.

16.     The Advisory Committee, which consists of members selected by the Compensation Committee, is a named fiduciary of the Plan and is generally responsible for the management, interpretation, and administration of the Plan, including, but not limited to, eligibility determinations, investment policies, benefit approvals, and other functions required, necessary, or advisable to carry out the purposes of the Plan.

17.     Ruane is the parent company of Ruane, Cunniff & Goldfarb L.P., a Delaware limited partnership and an investment advisor registered with the Securities and Exchange Commission under the Investment Advisers Act of 1940, and of Ruane, Cunniff & Goldfarb LLC, a Delaware limited liability company and registered broker dealer under the Securities Exchange Act of 1934.  The headquarters for Ruane, Cunniff & Goldfarb, Inc., Ruane, Cunniff & Goldfarb LLC and Ruane, Cunniff & Goldfarb L.P. are located at 9 West 57th Street, Suite 5000, New York, New York, 10019, and their principal places of business are New York, New York.

18.     Robert D. Goldfarb is a resident of New York.  He was Chairman and Chief Executive Officer of Ruane at all relevant times until he retired on March 31, 2016.  At all relevant times until March 31, 2016, Goldfarb also was the PSP's principal portfolio manager at

Ruane.  Goldfarb signed the 1998 and 2010 investment management agreements with DST on behalf of Ruane.  Goldfarb had decision-making authority regarding investment selection and monitoring by Ruane for the PSP.  Goldfarb was therefore a fiduciary to the Plan pursuant to ERISA §§ 3(21)(A)(i) and (iii) at all relevant times until March 31, 2016.

19.     On information and belief, David M. Poppe is a resident of New York.  He succeeded Goldfarb as Chief Executive Officer of Ruane in 2016 and therefore took over decision-making authority regarding investment selection and monitoring for the PSP.  Poppe was therefore a fiduciary to the Plan pursuant to ERISA §§ 3(21)(A)(i) and (iii) from April 1, 2016 until the investment management agreement was terminated on July 31, 2016.  Poppe was a member and/or partner of the Ruane Defendants until 2020 and received asset transfers from certain of the Ruane Defendants in the form of partnership distributions or equivalent transfers.

20.     On information and belief, Michael N. Sloyer is a resident of New York. He is the Chief Commercial Officer, the General Counsel, and a member and/or partner of the Ruane Defendants who received asset transfers from certain of the Ruane Defendants in the form of partnership distributions or equivalent transfers.

21.     On information and belief, John B. Harris is a resident of Illinois and is the Managing Director and a member and/or partner of the Ruane Defendants who received asset transfers from certain of the Ruane Defendants in the form of partnership distributions or equivalent transfers.

22.     On information and belief, Wendy D. Goodrich is a resident of New Jersey and is the Executive Vice President and a member and/or Partner of the Ruane Defendants who received asset transfers from certain of the Ruane Defendants in the form of partnership distributions or equivalent transfers.

23.     On information and belief, Patrick L. Dennis is a resident of New York and is the Chief Financial Officer and a member and/or partner of the Ruane Defendants who received asset transfers from certain of the Ruane Defendants in the form of partnership distributions or equivalent transfers.

24.     Defendants John Does 1–20 were and/or are members and/or partners of the Ruane Defendants during the relevant period who received asset transfers from certain of the Ruane Defendants in the form of partnership distributions or equivalent transfers.  The identities of John Does 1–20 are unknown.

**Jurisdiction and Venue**

25.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e), over the DST Parties' first cause of action for common-law indemnification and second cause of action for contribution.

26.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the DST Parties' third, fourth, and fifth state law causes of action—for actual or constructive fraudulent conveyances and for breach of contract—because these claims arise out of the same nucleus of operative fact as the DST Parties' federal question claims.

27.     Venue is proper in the Southern District of New York pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e), and 28 U.S.C. § 1391, because Ruane maintains its headquarters and principal place of business in the Southern District of New York, and the acts or omissions giving rise to these claims occurred in or were conducted through Ruane's New York City offices, which also are located in the Southern District of New York.

## Factual Allegations

### A.  Ruane and Goldfarb Were Fiduciaries to the Plan

28.     Ruane was first hired by DST in or around 1973 to serve as an investment manager for the PSP's assets, and served in that capacity until July 31, 2016.

29.     The February 1998 investment management agreement between Ruane and DST (the "1998 Agreement"), attached as Exhibit A, provided that Ruane had complete investment management discretion over the assets in the PSP.   Goldfarb executed the 1998 Agreement on behalf of Ruane.  The 1998 Agreement provides that Ruane "shall have full authority and sole discretion, on behalf and at the risk of [DST], from time to time to purchase, sell, convert and exchange for the [PSP] any types of securities which [Ruane] deems appropriate, subject only to the investment restrictions, if any, set forth in Schedule A."  The Agreement further stated that it was "subject to the terms and provisions . . . of the Employee Retirement Income Security Act of 1974."

30.     The parties executed another investment management agreement on February 2, 2010 (the "2010 Agreement").  The 2010 Agreement contains the same language quoted above and also was executed by Goldfarb.

31.     In each of the 1998 and 2010 Agreements, Ruane expressly "acknowledge[d] that it is a fiduciary with respect to the Plan."  Ruane and Goldfarb also were fiduciaries to the Plan under ERISA Section 3(21)(A).  ERISA provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, [or] (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."  ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A).  Each of Ruane and Goldfarb served as paid investment advisers to the Plan and exercised discretionary control over Plan assets.

      **B.**    **Ruane and Goldfarb Invested In Valeant**

      32.     In April 2010, Ruane and Goldfarb began purchasing shares of Valeant for the PSP.  In 2010, Ruane and Goldfarb purchased approximately 1.6 million shares of Valeant stock for the PSP at an average price of approximately $19 per share.

      33.     When purchased, the Valeant investment represented approximately 9% of the PSP's total assets (and a smaller percentage of the Plan as a whole).  Ruane and Goldfarb did not purchase any Valeant stock for the PSP after its initial acquisition in 2010.  By April 30, 2015, the Valeant position had grown to represent more than 40% of the PSP as a result of share price appreciation.

      34.     The Advisory Committee monitored Ruane's performance at all times during which Ruane was acting as the PSP's investment manager.  In fact, the Advisory Committee specifically focused on the growing concentration in the Valeant investment made by Ruane and Goldfarb, and sought their advice.

      35.     The Advisory Committee repeatedly sought Ruane and Goldfarb's views about the merits of the Valeant investment and inquired whether some or all of the Valeant position should be sold from the PSP.  In response, Ruane and Goldfarb consistently counseled the Advisory Committee against selling any of the PSP's position in Valeant.

      36.     In June 2014, for example, Goldfarb told the Advisory Committee that Defendants remained confident in the Valeant investment based on research and due diligence that he and his team had conducted.  In May 2015, Goldfarb again communicated to the Advisory Committee his assessment that the "[t]errific appreciation continues and the future looks even better. . . .  When you add Valeant's history of successful acquisitions, the future is

very bright."  Goldfarb further asserted that Ruane was "still beyond positive" about the Valeant investment.

37.     In June 2015, as the Valeant concentration had continued to increase, the Advisory Committee requested that Ruane and Goldfarb provide a written assessment of various options for holding, trimming or disposing of the Valeant investment at the Advisory Committee's next meeting.  Goldfarb also committed to seek legal advice from Ruane's counsel about whether the Valeant concentration was consistent with ERISA.  Goldfarb supplied the report requested by the Advisory Committee on June 30, 2015.  Goldfarb provided a bullish view of Valeant's prospects, stating that Valeant's CEO was "at the very top of [the] list" of CEOs with which Goldfarb had ever invested, and concluded that "rapid growth is still likely for a fair period of time."

C.     **The Advisory Committee Directs Ruane and Goldfarb to Reduce the Valeant Concentration in the PSP**

38.     On August 13, 2015, when Valeant's stock was trading at approximately $245–$250 per share, the Advisory Committee met to consider Goldfarb's report on Valeant. Notwithstanding Ruane and Goldfarb's continued conviction in the Valeant investment, including the bullish view expressed in the June 30 report, the Advisory Committee resolved to instruct Ruane and Goldfarb to implement concentration limits for the PSP.  The Advisory Committee discussed imposing concentration limits at 10%–15% on initial investments and 20%–25% on existing investments.  While that limit was to apply to all existing and future investments in the PSP, it was prompted by the Advisory Committee's analysis of the specific facts and circumstances surrounding the Valeant investment.

39.     The Advisory Committee discussed with Goldfarb the concentration limits on or around August 19, 2015.  Goldfarb continued to advocate for retaining the Valeant

investment but agreed to implement the concentration limits sought by the Advisory Committee. Goldfarb requested that the concentration limits be set at the higher end of the range discussed by the Advisory Committee at its August 13, 2015 meeting:  15% for initial investments and 25% for existing investments.  Goldfarb also requested discretion to sell the Valeant position in a prudent manner as required by ERISA.

40.     After considering Goldfarb's response, the Advisory Committee determined at an August 25, 2015 meeting that it would implement the concentration limits at the thresholds recommended by Goldfarb, and that Goldfarb should be instructed to reduce the Valeant investment in a prudent manner.

41.     Shortly after the August 25, 2015 meeting, the Advisory Committee instructed Ruane and Goldfarb that they would be required to adhere to the new concentration limits:  15% for new investments and 25% for existing investments.  This directive required Ruane and Goldfarb to sell a significant portion of the Valeant investment held in the PSP.

42.     On August 28, 2015, the Advisory Committee memorialized the direction it had communicated to Ruane and Goldfarb shortly after the August 25, 2015 Advisory Committee meeting.  The Advisory Committee's letter to Ruane and Goldfarb explained that the Advisory Committee had "concluded that the risks of holding such a large percentage of the Plan's assets in Valeant outweigh the potential rewards" and the Advisory Committee was therefore "compelled to request that Ruane implement the investment concentration limits."  The Advisory Committee instructed Ruane and Goldfarb "that (i) no additional investment in a single security can be made if, after such investment, the security will account for greater than 15% of the [PSP], and (ii) once an investment in a single security exceeds 25% of the [PSP], Ruane must begin to diversify such investment holdings to below 25%."  The Advisory Committee instructed

Ruane to implement this directive in a prudent manner using its best judgment, consistent with Ruane's obligations under ERISA.

43.     The Advisory Committee's direction was further confirmed in an amendment to the investment management agreement (the "2015 Amendment"), executed by the Advisory Committee and Ruane, effective August 26, 2015, that also set forth the Advisory Committee's directive.  The 2015 Amendment provided that "[i]f the value of any single security held in the Portfolio exceeds twenty-five percent (25%) of the market value of the Portfolio, [Ruane] must take appropriate and prudent actions to diversify such investment such that the Portfolio's investment in the single security is reduced to no more than twenty-five percent."

44.     Ruane and Goldfarb failed to comply with the Advisory Committee's directive.  Apart from the sale of a *de minimis* number of Valeant shares, Ruane and Goldfarb did not make any material sales of Valeant shares to comply with the Advisory Committee's instructions.  On August 28, 2015, Ruane and Goldfarb sold 4,200 shares of Valeant held in the PSP.  On September 16 and 17, 2015, Ruane and Goldfarb sold 5,000 shares and 10,000 shares of Valeant stock held in the PSP, respectively.  Thus, between August and September 2015, Ruane and Goldfarb sold only 19,200 shares of the 1,572,207 shares it originally purchased in 2010—less than 1.25% of the Valeant investment held in the PSP.

45.     Between August 28, 2015 and October 30, 2015, the Valeant share price fell from $236.12 to $93.77.  By the end of October 2015, the Valeant position comprised less than 25% of the PSP—principally due to the decline in Valeant's share price rather than sales by Ruane.  Had Ruane and Goldfarb reduced the Valeant stake to 25% of the PSP on the same dates in August and September 2015 on which Ruane and Goldfarb sold a *de minimis* number of Valeant shares held in the PSP, the sale of these additional shares would have yielded more than

$130 million in additional returns for the Plan—a gain of more than 400% on Ruane and Goldfarb's initial investment in Valeant.

       **D.**    **Ruane and Goldfarb's Investment in Valeant on Behalf of the PSP Results in Substantial Litigation**

       46.    On March 14, 2016, Plan participant Clive Cooper filed the first of what would become many litigations against Ruane and the DST Parties arising out of Ruane's investment management of the PSP.  Cooper filed a putative class action in the Southern District of New York alleging breaches of ERISA fiduciary duties by Ruane and the DST Parties based on the investment in Valeant made by Ruane and Goldfarb on behalf of the PSP.  Ruane thus has been aware at all times since at least March 2016 that it may be subject to liability in connection with its investment management of the PSP.

       47.    While the DST Parties were later dismissed from the *Cooper* action, Ruane thereafter successfully moved to compel arbitration of Cooper's claims under an arbitration agreement between Cooper and DST dated August 2008.  While Ruane is not a party to DST's arbitration agreements, Ruane obtained an order from the Southern District of New York dated August 15, 2017 compelling Cooper's claims against Ruane to arbitration on the ground of equitable estoppel.  That order currently is on appeal to the United States Court of Appeals for the Second Circuit.

       48.    There is no arbitration agreement between the DST Parties and Ruane, and any claims between or among the DST Parties and Ruane are not subject to arbitration.

       49.    As a result of the order obtained by Ruane in *Cooper*, Ruane has been named as a party and participated in hundreds of later-filed arbitrations brought by Plan participants against the DST Parties and Ruane arising out of the Valeant investment.

14

50.     On April 11, 2018, certain Plan participants who were subject to arbitration agreements with DST began serving demands for arbitration alleging that the DST Parties and Ruane had breached their fiduciary duties under ERISA as a result of Ruane and Goldfarb's investment in Valeant on behalf of the PSP.  By July 2020, 486 Plan participants had served arbitration demands upon DST.

51.     As a result of the ruling Ruane obtained compelling arbitration of Cooper's claims, Ruane has participated in the AAA Arbitrations filed by Plan participants who were subject to arbitration agreements with DST.  For example, from April 2018 through June 2020, Ruane participated in AAA Arbitrations by:  (i) selecting arbitrators for the various individual arbitrations; (ii) filing answers to the arbitration claimants' demands; (iii) serving and responding to written discovery requests; (iv) serving expert reports; and (v) participating in depositions of the witnesses produced by the DST Parties and various arbitration claimants.

52.     Ruane also has been named as a party in the Federal Actions currently pending in the Southern District of New York against the DST Parties and Ruane arising out of the Valeant investment:

> (a)     On September 1, 2017,  Plan participants Michael L. Ferguson, Myrl C. Jeffcoat, and Deborah Smith (the "*Ferguson* Plaintiffs") filed a representative action in the Southern District of New York alleging breaches of various ERISA fiduciary duties by the DST Parties and Ruane, including alleged breaches based on the investment in Valeant made by Ruane and Goldfarb on behalf of the PSP.  On October 21, 2019, the DST Parties also made cross-claims against Ruane for contribution and indemnification in the *Ferguson* action.  A motion by the *Ferguson* Plaintiffs for class certification is currently pending before the Court;

> (b)     On September 28, 2018, Plan participants Robert Canfield, Bonnie Kartz, Latrecia Onunkwor, Diana Weaver, and David Ostermeyer (the "*Canfield* Plaintiffs") filed an action in the Southern District of New York alleging breaches of various ERISA fiduciary duties by the DST Parties and Ruane, including alleged breaches based on the investment in Valeant made by Ruane and Goldfarb on behalf of the PSP;

(c)      On November 5, 2018, Plan participants Mark Mendon and Jill Pehlman (the "*Mendon* Plaintiffs") filed an action in the Southern District of New York alleging breaches of various ERISA fiduciary duties by the DST Parties and Ruane, including alleged breaches based on the investment in Valeant made by Ruane and Goldfarb on behalf of the PSP; and

(d)      On October 8, 2019, the Secretary of the United States Department of Labor filed an action in the Southern District of New York alleging breaches of various ERISA fiduciary duties by the DST Parties and Ruane, including alleged breaches based on the investment in Valeant made by Ruane and Goldfarb on behalf of the PSP.

53.      On or about June 5, 2020, Ruane reached a purported settlement with a group of Plan participants (the "Settling Parties") consisting of nearly every claimant in the AAA Arbitrations, the *Canfield* Plaintiffs, and the *Mendon* Plaintiffs.  The settlement included individual releases of claims against Ruane and certain related individuals and entities by the Settling Parties.  The settlement agreement contains no apportionment of fault, if any, between the DST Parties and Ruane.

**E.      The Ruane Defendants Render Ruane Insolvent by Improperly Transferring Assets to the Individual Defendants**

54.      In the face of these litigations, and despite Ruane's complete decision-making authority with respect to the investment decisions relating to Valeant, Ruane appears to have engaged in a scheme to transfer its assets outside the reach of creditors and litigation claimants such as the DST Parties.

55.      Ruane and its counsel have repeatedly asserted that Ruane lacks the financial wherewithal to contribute to a litigation settlement at a level commensurate with its fault or to withstand any significant judgment in the AAA Arbitrations or the Federal Actions. By way of example, the lawyers representing certain AAA Arbitration claimants asserted in a July 24, 2020 brief filed in this Court—after Ruane's purported settlement of the AAA Arbitrations—that "Ruane's financial solvency is highly questionable since its assets are

16

primarily transferrable client accounts." *Canfield* v. *SS&C Techs. Holding, Inc.*, Civ. 1:18-cv-08913-ALC, ECF No. 61 at 12; *Mendon* v. *SS&C Techs. Holding, Inc.*, Civ. 1:18-cv-102520-ALC, ECF No. 61 at 12.  On information and belief, Ruane and/or its counsel negotiated a settlement of the AAA Arbitrations on the basis of assertions that Ruane lacked sufficient assets to fund a more significant settlement or satisfy any potential judgment.

56.     Ruane, however, has earned and continues to earn substantial annual revenues.  Based on publicly available disclosures filed by Ruane with the Securities and Exchange Commission ("SEC"), Ruane appears to routinely earn more than $100 million in annual revenue.  As publicly disclosed in SEC filings, Ruane managed over $17 billion in assets as of March 2017 and over $11 billion in assets as March 2020.  Ruane and/or its affiliated entities typically charge clients an annual management fee of approximately 1.0%.  A one-percent management fee would have yielded approximately $170 million in annual revenue on $17 billion in managed assets in 2017 and approximately $110 million on $11 billion in managed assets in 2020.

57.     Ruane appears to have transferred the profits it achieved on these revenues to the Individual Defendants and others in order to remove those assets from the reach of creditors and advantage its litigation position.  These transfers (the "Fraudulent Profit Distributions") rendered Ruane insolvent—by its own admission—after taking into account the contingent liability faced by Ruane from a judgment or settlement of the various litigations arising out of its management of the PSP.  Ruane has been aware of these contingent liabilities since at least March 2016 when the *Cooper* lawsuit was filed.

58.     On information and belief, Ruane made these Fraudulent Profit Distributions to current or former insiders such as partners or members without fair consideration

and with full knowledge that, upon transfer, those assets would no longer be available to satisfy any liability associated with the constellation of litigation spawned by Ruane's investment in Valeant on behalf of the PSP.

59.     Ruane nevertheless made those distributions in order to prevent its creditors—including the DST Parties—from making a full and fair recovery stemming from Ruane's management of the PSP.  Moreover, after improperly distributing funds to the Individual Defendants, Ruane leveraged its resulting insolvency to secure a settlement with the arbitration claimants and/or others with a view to paying less than Ruane's proportionate share of fault.

**Count I**
**Common-Law Indemnification**
**(Against Ruane and Goldfarb)**

60.     The DST Parties repeat and re-allege Paragraphs 1–59 above.

61.     Ruane was an investment manager, as defined by ERISA § 3(38), 29 U.S.C. § 1002(38), appointed by the Advisory Committee, pursuant to ERISA § 402(c)(3), 29 U.S.C. § 1102(c)(3), to be the investment manager for the PSP.

62.     From April 2010, when he first purchased Valeant on behalf of the PSP, through March 31, 2016, when he retired, Goldfarb was responsible for managing the PSP portfolio on Ruane's behalf.  Goldfarb signed the 1998 and 2010 investment management agreements with DST, including the 2015 Amendment to the 1998 Agreement, on behalf of Ruane.  Goldfarb had decision-making authority regarding Ruane's investment selection for the PSP.  Goldfarb was therefore a fiduciary to the Plan pursuant to ERISA §§ 3(21)(A) at all relevant times until March 31, 2016.

63.     As fiduciaries to the PSP, Ruane and Goldfarb had a duty to actively and prudently invest the PSP's assets, and further possessed all requisite powers and abilities to

invest the PSP's assets based upon, *inter alia*, the terms of the investment management agreements.  Ruane had the complete discretionary authority to purchase, retain, or sell the Valeant investment on behalf of the PSP.

64.     Had Ruane and Goldfarb promptly implemented the Advisory Committee's directive to impose concentration limits, the Plan and Plan participants would have achieved extraordinary returns on the Valeant investment. At a minimum then, the damages alleged in the Federal Actions and AAA Arbitrations would be substantially reduced, and it is likely that the Federal Actions and the AAA Arbitrations would not have been brought at all.

65.     Thus, to the extent the DST Parties may be found liable to the Plan or any Plan participant, their conduct was not a cause or a substantial cause of any harm or loss to the Plan or Plan participants, nor a cause or substantial cause of the Plan or Plan participants being deprived of any assets to which they were entitled, nor a cause of any diminution of Plan assets.

66.     If the DST Parties (i) are found to be liable, in whole or in part, for any claim asserted in the Federal Actions or AAA Arbitrations (liability which the DST Parties deny), or (ii) otherwise resolve such claims to obtain a release of liability, Ruane and Goldfarb are substantially more at fault to the extent that the Plan or the Plan participants suffered any harm or losses or were deprived of any assets to which they were entitled.

67.     Accordingly, the Court should order Ruane and Goldfarb to indemnify the DST Parties for the entirety of any judgment or any settlements reached to obtain releases of liability for the DST Parties, and the costs associated with defending such actions, including, but not limited to, the costs associated with filing and maintaining arbitrations with the AAA Arbitrations.

**Count II**
**Contribution**
**(Against Ruane and Goldfarb)**

68.     The DST Parties repeat and re-allege Paragraphs 1–67 above.

69.     Alternatively, if the DST Parties are found to be liable for any claim asserted in the Federal Actions or AAA Arbitrations (liability which the DST Parties deny), or otherwise resolve such claims to obtain a release of liability, then Ruane and Goldfarb are liable to the DST Parties for their respective portions of any damages awarded and settlements reached to obtain releases of liability for the DST Parties, based on Ruane and Goldfarb's proportionate share of fault.

70.     Accordingly, the DST Parties ask this Court to order that Ruane and Goldfarb be held liable to the DST Parties for contribution and that Ruane and Goldfarb be required to pay their share of any damages awarded and settlements reached to obtain releases of liability for the DST Parties, and the costs associated with defending such actions, including, but not limited to, the costs associated with filing and maintaining arbitrations with the AAA, based on Ruane and Goldfarb's proportionate share of fault, as determined by the Court.

**Count III**
**Actual Fraudulent Conveyance**
**(Against All Defendants)**

71.     The DST Parties repeat and re-allege Paragraphs 1–70 above.

72.     The DST Parties are creditors of Ruane under New York Debtor and Creditor Law ("NYDCL") § 270.

73.     Upon information and belief, since Clive Cooper filed an action in the Southern District of New York on March 14, 2016, certain of the Ruane Defendants have improperly distributed assets to its members and/or partners.  Upon information and belief, the Individual Defendants and others were recipients of the Fraudulent Profit Distributions.

20

74.     Upon information and belief, the Fraudulent Profit Distributions were made to insiders of the Ruane Defendants without fair consideration.

75.     At the time Ruane made the Fraudulent Profit Distributions, Ruane: (i) was insolvent; and/or (ii) was rendered insolvent as a result, and can no longer satisfy its obligations to creditors as they come due.

76.     The Fraudulent Profit Distributions were made in furtherance of the scheme to defraud Ruane's creditors and therefore had the effect of hindering, delaying and defrauding such creditors.

77.     In making the Fraudulent Profit Distributions, Ruane and the Individual Defendants acted with an actual intent to hinder, delay and/or defraud Ruane's creditors, including the DST Parties.

78.     The Fraudulent Profit Distributions were actual fraudulent conveyances as to the DST Parties under the former NYDCL §§ 276 and/or 277(a), which apply to transfers made or obligations incurred prior to April 4, 2020.

79.     By reason of the foregoing, pursuant to the former NYDCL §§ 276 and/or 277(a), the DST Parties are entitled to a judgment against Ruane: (a) avoiding the Fraudulent Profit Distributions; (b) directing the Fraudulent Profit Distributions to be set aside; and (c) requiring the Individual Defendants, as recipients of the Fraudulent Profit Distributions, to return the Profit Distributions, or the value thereof, to be held in trust for the benefit of Ruane's creditors.

80.     In addition, the DST Parties are entitled to recover their reasonable attorneys' fees under the former NYDCL § 276-a, which applies to transfers made or obligations incurred prior to April 4, 2020, as well as punitive damages in an amount to be determined.

**Count IV**
**Constructive Fraudulent Conveyance**
**(Against All Defendants)**

81.     The DST Parties repeat and re-allege Paragraphs 1–80 above.

82.     The DST Parties are creditors of Ruane under NYDCL § 270.

83.     Upon information and belief, since Clive Cooper filed an action in the
Southern District of New York on March 14, 2016, certain of the Ruane Defendants have
improperly distributed assets to its members and/or partners.  Upon information and belief, the
Individual Defendants and others were recipients of the Fraudulent Profit Distributions.

84.     Upon information and belief, the Fraudulent Profit Distributions were
made to insiders of the Ruane Defendants without fair consideration.

85.     At the time Ruane made the Fraudulent Profit Distributions, Ruane: (i)
was insolvent or became insolvent as a result of such transfers; (ii) was engaged in business or a
transaction, or was about to engage in business or a transaction, for which any property
remaining with Ruane was an unreasonably small capital; and/or (iii) intended to incur, or
believed that it would incur, debts that would be beyond Ruane's ability to pay as such debts
matured.

86.     The Fraudulent Profit Distributions were constructive fraudulent
conveyances as to the DST Parties under the former NYDCL §§ 273–75, which apply to
transfers made or obligations incurred prior to April 4, 2020.

87.     By reason of the foregoing, pursuant to the former NYDCL §§ 273–75,
the DST Parties are entitled to a judgment against Ruane: (a) avoiding the Fraudulent Profit
Distributions; (b) directing the Fraudulent Profit Distributions to be set aside; and (c) requiring
the Individual Defendants, as recipients of the Fraudulent Profit Distributions, to return the

Fraudulent Profit Distributions, or the value thereof, to be held in trust for the benefit of Ruane's creditors.

## Count V
## Breach of Contract
## (Against Ruane)

88.     The DST Parties repeat and re-allege Paragraphs 1–87 above.

89.     The investment management agreements constitute valid and binding contracts between DST and Ruane, under which Ruane was obligated to comply with the provisions of ERISA.

90.     Should Ruane be found liable to have breached the provisions of ERISA, it will have breached a material term of the parties' investment management agreements.

91.     To the extent Ruane is found to have breached the investment management agreements, Ruane's breach has directly and proximately caused damages to the DST Parties.

## Prayer for Relief

WHEREFORE, the DST Parties demand:

A.     Judgment against Goldfarb and the Ruane Defendants for common-law indemnification of the entirety of any judgment, settlements reached to obtain releases of liability for the DST Parties, and the costs associated with bringing, maintaining, and defending the Federal Actions and AAA Arbitrations, including all attorneys' fees;

B.     Judgment against Goldfarb and the Ruane Defendants for contribution and payment of Defendants' proportionate share of any damages award, total settlements reached to obtain releases of liability and the costs associated with bringing, maintaining, and defending the Federal Actions and AAA Arbitrations;

C.     Setting aside and annulling the Fraudulent Profit Distributions;

D.    Judgment against Defendants for breaching the parties' investment management agreements and damages in an amount to be determined at trial, together with pre- and post-judgment interest according to the statutory rate;

D.    Attorneys' fees, costs, and disbursements incurred as a result of this action; and

E.    Such other and further relief as the Court deems just and proper.

Dated:  November 11, 2020
        New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP


By: /s/ Lewis R. Clayton
Lewis R. Clayton (lclayton@paulweiss.com)
Jessica S. Carey (jcarey@paulweiss.com)
Jeffrey J. Recher (jrecher@paulweiss.com)
Joshua K. Kaye (jkaye@paulweiss.com)

1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3215
Fax:  (212) 492-0215

*Counsel for Plaintiffs DST Systems, Inc., the
Advisory Committee of the DST Systems, Inc.,
401(k) Profit Sharing Plan, and the Compensation
Committee of the Board of Directors of DST
Systems, Inc.*